**CARMICHAELS ARBORS ASSOCI-ATES, a Pennsylvania Limited Partnership, Plaintiff,**

v.

**UNITED STATES of America, acting Through the DEPARTMENT OF HOUSING AND URBAN DEVELOP-MENT, Defendant.**

Civ. A. No. 89–2252.

United States District Court,
W.D. Pennsylvania.

April 14, 1992.

John P. Fernsler, Reed Smith Shaw and McClay, Pittsburgh, Pa., for plaintiff.

Robert L. Eberhardt, Asst. U.S. Atty., Pittsburgh, Pa., Ellen D. Law, Arthur Goldberg, Sanjay M. Bhambhani, Dept. of Justice, Federal Programs Branch, Washington, D.C., for defendant.

## MEMORANDUM OPINION

MENCER, District Judge.

Plaintiff Carmichaels Arbors entered into a Housing Assistance Payment contract ("HAP contract") with the United States Department of Housing and Urban Development to construct an apartment complex in Greene County, Pennsylvania, for low-income elderly and handicapped persons. HUD was authorized to enter into HAP contracts under Section 8 of the United States Housing Act of 1937, as amended, codified at 42 U.S.C. § 1437f.

The Section 8 program was designed to provide housing for low-income persons through the use of private sector developers or through the use of local public housing authorities. The rent paid varied according to the individual tenant's income. HUD paid an additional sum to the owner to make up the difference between what the tenants were required to pay and what rents could have been collected if the owner rented the housing in the open market. In this case, the means of calculating HUD's payment to the owner is at the foundation of the dispute.

Under Section 8, the initial rent for a unit is to be established using a "fair market rental" analysis conducted by HUD. 42 U.S.C. § 1437f(c)(1). HUD is also directed to make periodic adjustments to the payments made to the owner:

> The assistance contract shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula.

42 U.S.C. § 1437f(c)(2)(A). At the time that HUD and Carmichaels Arbors entered into the HAP contract, Section 8 also contained the following provision:

> Adjustments in the maximum rents as hereinbefore provided shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Secretary.

42 U.S.C. § 1437f(c)(2)(C) (West 1978) (before amendments).

The HAP contract between the parties specified that HUD would make adjustments according to Automatic Annual Adjustment Factors (AAAFs), which were to be published in the Federal Register.[1] The use of the AAAFs was authorized in 42 U.S.C. § 1437f(c)(2)(A), which permitted the Secretary to make adjustments according to a "reasonable formula." In the same section of the contract, a subsection entitled "Overall Limitation" was included. This overall limitation clause reiterated the qualification expressed in 42 U.S.C. § 1437f(c)(2)(C) that rents paid under the HAP contract should not materially exceed rents for similar unassisted rental units.

---

1. AAAFs are percentage factors produced by HUD's Office of Economic Affairs, Division of Economic Market Analysis. They are developed using two market surveys, the Consumer Price Index and the American Housing Surveys. Shenk Declaration at 1–2.

For the first several years of the contract period, HUD made adjustments in the rent levels using the published AAAFs. For the period beginning on February 19, 1987, however, HUD sent Carmichaels a payment lower than an application of the AAAFs would have produced. HUD claims that the rents produced by an application of the AAAFs at that time would have materially exceeded the rents that the property would have generated if it had been an unassisted rental property. HUD claims that this result was prohibited under 42 U.S.C. § 1437f(c)(2)(C) and under the corresponding contract provision in the HAP contract.

HUD has not disclosed how it made the initial determination to investigate whether the rent paid to a given property exceeded rents for similar unassisted units. In its briefs, HUD contends that it conducted "spot checks" on rents whenever it had "reason to believe that the AAAF-level rent increases might be excessive." HUD's Reply Brief at 10. These spot checks, or comparability studies, were conducted by HUD field staff. The staff members examined rents at three, four, or five unassisted units that were used in determining the initial rent for the assisted unit, or, if the original units were no longer available or comparable, then the field staff used other comparable projects located in the same general geographic region. Then, using acceptable appraisal techniques, the HUD field staff members adjusted the rents of each comparable project, and compared these rents against what the AAAF would produce. If there were no material differences, the AAAF rent would be applied as usual; otherwise, the rent for the assisted unit was reduced. Tahash Declaration at 2–3.

Apparently this was the procedure used to arrive at the rent reduction for Carmichaels Arbors. Carmichaels Arbors protested the rent reduction and a series of letters were exchanged. In 1988, Carmichaels Arbors' position was strengthened with the filing of the decision in *Rainier*

*View Assoc. v. United States,* 848 F.2d 988 (9th Cir.1988). In the *Rainier View* court's analysis, HUD was required under the terms of the HAP contract to use the AAAFs because it considered HUD to have elected a formula method of calculating adjustments. The use of the comparability studies was seen as an independent basis for determining annual rent adjustments and was adjudged to violate the owner's right to a calculation based on the AAAFs. HUD considered *Rainier View* to have been wrongly decided and declined to follow its holding outside of the Ninth Circuit. Accordingly, HUD refused to apply the *Rainier View* holding to Carmichaels Arbors because it was located in Pennsylvania. Carmichaels Arbors filed suit on November 7, 1989.

One month following the *Rainier* decision, Congress enacted the Department of Housing and Urban Development Reform Act of 1989, Pub.L. No. 101–235, 103 Stat. 1987 (1989). Although the primary impetus for this legislation appears to have been to address a scandal at HUD involving the improper allocation of housing construction contract awards, the legislation also addressed a number of other topics. Section 801 of that act amended 42 U.S.C. § 1437f(c)(2)(C), the overall limitation provision, at least in part as a response to the ruling in *Rainier View.* The amendment operated prospectively to authorize the use of comparability surveys as an independent method of adjusting rent:

> In implementing the [overall] limitation ... the secretary shall establish regulations for conducting comparability studies for projects where the secretary has had reason to believe that the application of the formula adjustments under subparagraph (A) would result in such material differences.

42 U.S.C. § 1437f(c)(2)(C), as modified.

The amendment also operated retrospectively to "settle" with those owners, like Carmichaels, whose rents had been previously adjusted on the basis of comparability studies.[2] Under section 801, HUD was

---

2. The retrospective component of § 801 also applied to those owners whose contracts conditioned any rental adjustment on the owner's request and who failed to make such a request.

to adjust the rents for the period of 1980 to the present by either applying the AAAFs to the portion of the total contract rent that would not be used by the owner to service his debt on the property, or by multiplying thirty percent of the proper AAAF by the entire contract. HUD was directed to apply whichever approach resulted in the greater payment to the owner. 42 U.S.C. § 1437f(c)(2)(C).

This case was first assigned to a different district judge on this court. While it was before that judge, HUD brought a motion to dismiss, arguing 1) that the passage of section 801 rendered Carmichaels Arbors' claim moot; and 2) that this court did not have jurisdiction to entertain a declaratory judgment action on a claim on a contract to which the United States was a party and that instead the suit should have been brought in the United States Claims Court. HUD's Motion to Dismiss at p. 1. Carmichaels Arbors did not file a brief in opposition; instead it filed a Motion to Defer Disposition of the case pending review by the Ninth Circuit of a district court opinion holding that section 801 was unconstitutional. In the Motion to Defer Disposition of the case, Carmichaels Arbors identified the "critical issue" facing the court to be whether section 801 was constitutional. Carmichaels Arbors also filed two Notices of Decisions in which district courts within the Ninth Circuit found that section 801 was unconstitutional.

On February 14, 1991, the judge issued an opinion denying HUD's Motion to Dismiss. Responding to HUD's argument that the intervening passage of section 801 rendered Carmichaels Arbors' claim moot, the judge noted that this line of reasoning assumed the constitutionality of section 801, and declined to consider HUD's mootness argument without examining section 801's constitutionality. He held that section 801 was unconstitutional with regard to its retroactive provision, but constitutional with regard to its prospective provision. Opinion on Motion to Dismiss at 8–10. The judge also held that this court had jurisdiction to issue a declaratory judgment ruling in cases involving contracts to which the United States was a party.

On February 3, 1992, this case was reassigned to the undersigned judge. Both parties have now moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

## A. *The Doctrine of Law of the Case*

Carmichaels Arbors first argues in favor of its Motion for Summary Judgment that the court's Opinion on Motion to Dismiss already stated that section 801 was unconstitutional in its retroactive effect. Carmichaels Arbors considers this favorable judicial pronouncement to constitute the law of the case, which the court should not reexamine on this Motion.

■ The doctrine of law of the case states that a successor judge should respect a decision made by a predecessor judge on the same case. *See TCF Film Corp. v. Gourley*, 240 F.2d 711, 713 (3d Cir.1957); *United States v. Wheeler*, 256 F.2d 745, 746 (3d Cir.), *cert. denied* 358 U.S. 873, 79 S.Ct. 111, 3 L.Ed.2d 103 (1958). The most common rationales advanced for this rule include the need to preserve the "orderly functioning of the judicial system," *Gourley*, 240 F.2d at 714, and to avoid unseemly conflicts and protracted litigation, *Sutherland Paper Co. v. Grant Paper Box Co.*, 9 F.R.D. 422, 423 (W.D.Pa. 1949).

■ Nevertheless, the rule is more a statement of policy than a reflection of the limits of the successor judge's power. *See* Glenn, Annotation, "Propriety of Federal District Judge's Overruling or Reconsidering Decision or Order Previously Made in Same Case by Another District Judge," 20 A.L.R. Fed. 13, 30 (1974). The rule should be balanced against the party's right to request that the court reconsider an earlier judgment implicit in Rules 52(a), 59 and 60 of the Federal Rules of Civil Procedure. In the Third Circuit, the balance is struck in favor of permitting the successor judge to reconsider the decision of the predecessor judge if the predecessor judge is unavailable to reconsider the decision, as in this case. *Gourley*, 240 F.2d at 714; *United States Gypsum Co. v. Schiavo Bros., Inc.*,

668 F.2d 172, 176–77 (3d Cir.1981), *cert. denied* 456 U.S. 961, 102 S.Ct. 2038, 72 L.Ed.2d 485 (1982); *Degregorio v. O'Bannon,* 86 F.R.D. 109, 113 (E.D.Pa.1980). The requirement of the predecessor judge's unavailability satisfies the policy concerns of avoiding unseemly conflicts and preserving order in the judicial system.

■ Therefore this judge is free to reconsider the predecessor judge's pronouncements regarding the constitutionality of section 801. This conclusion is anchored by the consideration that the predecessor judge did not have the benefit of HUD's views on section 801's constitutionality when he issued his opinion.[3] An evaluation of section 801's constitutionality follows.[4]

## B. *Constitutionality of Section 801*

Section 801 affects the HAP contract between the parties in two ways: first, it expressly authorizes HUD to use comparability studies in all future rental adjustments; and second, it directs HUD to make payments to, *inter alia,* owners whose rents in the past had been reduced by the application of comparability studies. Carmichaels Arbors claims that these directives interfere with its right under the HAP contract to regular rental adjustments calculated in a prescribed manner. In Carmichaels Arbors' view, section 801 represents a Congressional attempt to abrogate through legislative fiat a debt owed by the United States to a private party. Debt avoidance by the United States is permitted by the Constitution in only very narrow circumstances, none of which are present in this case.

HUD asserts that the Constitution is not implicated by section 801 because, contrary to the position adopted by Carmichaels Arbors, the HAP contract does not grant the owner a right to any specific manner of calculation of the rental adjustments. The due process clause of the Fifth Amendment, like the due process clause of the Fourteenth Amendment, protects life, liberty, and property interests only. *See Jolly v. Listerman,* 672 F.2d 935, 941 (D.C.Cir. 1982); *Federal Deposit Ins. Corp. v. Morrison,* 747 F.2d 610, 613 (11th Cir.1984), *reh. denied,* 763 F.2d 419 (11th Cir.1985), *cert. denied* 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985). If the claimed right cannot be found in the contract, Carmichaels Arbors would have no property right on which to base standing to attack the constitutionality of section 801.

Carmichaels Arbors characterizes its right under the HAP contract as an entitlement to rental adjustments on an annual basis calculated using the aforementioned AAAFs. 42 U.S.C. § 1437f(c)(2)(A) provides for annual adjustments "to reflect changes in the market rentals established in the housing area for similar types of dwelling units or, if the Secretary determines, on the basis of a reasonable formula." Carmichaels Arbors interprets this wording to require that the Secretary choose to make the annual adjustments either based on a market survey or on the basis of a reasonable formula. It argues that this interpretation comports with HUD's understanding of the law as well. The HAP contract specifies that:

> On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government.

**3.** By the same token, HUD's suggestion that the question of section 801's constitutionality was not before the predecessor judge is not well taken. One of the grounds on which HUD urged the predecessor judge to dismiss the case was the claim that the intervening enactment of section 801 rendered Carmichaels Arbors' claim moot. Although Carmichaels Arbors never filed a brief in opposition to the Motion to Dismiss, it brought to the court's attention several cases which held section 801 unconstitutional. It is therefore clear that Carmichaels Arbors' primary argument against the mootness point was that section 801 was unconstitutional despite the absence of any allegation that section 801 was unconstitutional in the Complaint. Furthermore, the absence of such an allegation is hardly surprising given that the Complaint was filed prior to section 801's enactment.

**4.** We decline to reconsider the predecessor judge's ruling that jurisdiction is proper in this court. That issue was fully briefed by HUD.

HAP Contract, ¶ 1.8(b)(2). Carmichaels Arbors argues that this sentence represents the Secretary's choice to exercise the reasonable formula option and to forego the market survey option.

Holding HUD to its choice to apply the AAAFs does not eviscerate the overall limitation provisions in the statute and in the contract, plaintiff urges. This misunderstanding is said to be the flaw in the analysis of *Sheridan Square Partnership v. United States*, 761 F.Supp. 738 (D.Colo. 1991), which held that HUD could revise rental adjustments under HAP contracts in the manner employed to arrive at the rental adjustments for Carmichaels Arbors. Quite the contrary, Carmichaels Arbors readily accepts that the overall limitation provision "limits, qualifies, and works with the formula method," but insists that once having elected the formula method, HUD is not free to arrive at an annual rental adjustment without using the AAAFs.

■ Carmichaels Arbors is correct in its general orientation toward advancing a construction that gives effect to the plain meaning of the contractual terms. If a contract's provisions are unambiguous, a court must enforce the terms as written. *E.g., Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1010 (3d Cir. 1980) (applying Pennsylvania law); *and see Chevron U.S.A., Inc. v. Natural Resources Defense Counsel, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (a federal court must give effect to clear language in a statute). In Carmichaels Arbors' view, the provision electing the AAAF formula method and the overall limitation provision can be reconciled in only one way: if HUD finds that the use of the AAAFs would result in a payment that would exceed rents paid for comparable unassisted units, it must adjust the payment by recalculating the AAAFs, and then apply the adjusted AAAFs to the

unit.[5] Only a recalculation of the AAAFs can satisfy the mandatory character of the language that the "contract rents shall be adjusted" using the AAAFs.

A similar argument convinced the Ninth Circuit panel that decided *Rainier View Assoc. v. United States*, 848 F.2d 988 (9th Cir.1988). The *Rainier View* court held that the statute clearly requires that HUD make an election between a market survey approach or a formula approach to determining rental adjustments. *Id.* at 991. The basis for the court's conclusion was two-fold: one, the presence of the word "or" in section 8(c)(2)(A) which provides for the market survey or formula approach; and two, the fact that HUD's own regulation, 24 C.F.R. § 888.204, *see supra*, n. 5, provides that if the rent adjustment produced by the AAAFs resulted in a too low rent that the HUD field office would consider adjusting the AAAFs.

■ Although this interpretation certainly finds some support in section 8(c)(2)(A), it does not adequately account for the overall limitation provision. The overall limitation provision states that "not withstanding [sic] any other provisions of this contract, adjustments ... shall not result in material differences" between assisted and comparable unassisted units. HAP Contract, ¶ 1.8(d). Or, stated another way, no matter what any other section in the contract says, no rental adjustment can materially exceed rents paid for comparable unassisted units. Under the language of ¶ 1.8(c), its mandate may and must be carried out even if this action violates every other provision of the contract. Furthermore, there is nothing said regarding how HUD is to determine whether any material differences exist, or what method HUD is to employ to adjust rents downward. Thus, contrary to the conclusion of the *Rainier View* court, 848 F.2d at 991, the plain language of the contract does not by any means mandate that

**5.** The idea that an AAAF should be recalculated to better reflect the housing market conditions found in a specific area is based on some precedent. In 1977, HUD promulgated a regulation subsequently enacted and codified at 24 C.F.R. § 888.201 (1978) which provided that HUD "would consider establishing separate or revised

Automatic Annual Adjustment Factors for [a] particular area" if the application of the AAAFs resulted in rents substantially lower than rents charged for comparable unassisted units and if the owner could show that the costs of operating this comparable housing increased at a substantially greater rate than the AAAFs.

the recalculation of the rental adjustments be done using the AAAFs.

Furthermore, the overall limitation provision almost seems to require that HUD undertake some sort of market survey to determine whether a material difference exists. Carmichaels Arbors has not stated, and the court itself cannot imagine, how HUD could know whether there is any material difference in rents between an assisted unit and a comparable unassisted unit unless someone undertakes to determine what the rents are at the comparable unassisted units. And once it is conceded that HUD can undertake a market survey to decide whether a material difference exists, it is oddly formalistic to require that HUD recalculate the AAAFs to arrive at a number that is not materially different from the number produced by the market survey. By definition, the number will not be materially different. *Accord, Sheridan Square Partnership,* 761 F.Supp. at 744.

HUD's interpretation of the HAP contract provides a far more satisfying implementation of the overall limitation provision than does that of Carmichaels Arbors. It also properly accommodates the language in ¶ 1.8(b)(2) providing for annual rental adjustments on the basis of the AAAFs. Ordinarily, HUD used the AAAFs to produce the rental adjustments that would be paid to the owners. It was only in the special case when the overall limitation provision was implicated, i.e., when HUD suspected that the AAAFs were producing numbers materially different from those rents generated by comparable unassisted units, that HUD would use comparability studies to confirm that materially different rents were being generated. But even in those cases in which HUD conducted comparability studies, HUD would still pay the owner the AAAF-based rent unless the comparability studies demonstrated that the rent adjustments were materially different from the prevailing market rents.[6] Thus, as a general rule HUD followed the language in the HAP contract to use the AAAFs unless to do so would violate the overall limitation clause, which by its express terms was to be given force despite any other provision in the HAP contract.[7] *See National Leased Housing Assoc. v. United States,* 22 Cl.Ct. 649, 660 n. 8 (1991); *Sheridan Square Partnership,* 761 F.Supp. at 743.[8]

**6.** Carmichaels Arbors insists that the court should not accept HUD's assertion that the comparability studies were conducted in a different manner than the fair market rent analysis that is made at the beginning of the contract to determine the initial rent. Under our interpretation of the HAP contract, the validity of this distinction is irrelevant: any reasonable means of ascertaining whether material differences in rents exist is authorized under the terms of the contract.

**7.** Carmichaels Arbors also submits that the court should not rely on HUD's description of how it carried out the comparability studies in deciding these cross-motions for summary judgment. However, under the standard for granting summary judgment as outlined in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) and its progeny, the party opposing a motion for summary judgment may not merely deny the assertions made by the movant, but must identify facts of record that would contradict the facts identified by the movant. *Childers v. Joseph,* 842 F.2d 689, 694–95 (3d Cir.1988). Carmichaels Arbors has not identified any facts that contradict HUD's assertion that it declined to use the AAAF-produced numbers only if it determined that to do so would result in a materially different rent.

**8.** The parties raise an interesting question regarding what effect the enactment of section 801 has on the methodology of calculating rental adjustments under the HAP contracts. HUD argues that section 801's affirmation of HUD's practice of conducting comparability studies is persuasive authority that the use of comparability studies is authorized under section 8. *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 846, 106 S.Ct. 3245, 3254, 92 L.Ed.2d 675 (1986); *Regents of the University of California v. Bakke,* 438 U.S. 265, 349–50, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). In addition, Congress can subsequently clarify the statutory context for statutorily-authorized contracts and that clarification is to be given weight by the courts. *Federal Housing Admin. v. The Darlington, Inc.,* 358 U.S. 84, 91–92, 79 S.Ct. 141, 146–147, 3 L.Ed.2d 132 (1958). Carmichaels Arbors argues in opposition that notwithstanding any of the above-mentioned powers, Congress may not constitutionally abrogate a debt of the United States unless such action is taken pursuant to a war or emergency-type power. *United States Trust Co. v. New Jersey,* 431 U.S. 1, 29, 97 S.Ct. 1505, 1521, 52 L.Ed.2d 92 (1977) (applying contract clause and limiting state's power to abrogate contract). Because we have determined independently of any Congressional pronouncement that the HAP contract authorizes the use

 As the preceding exposition makes obvious, the portion of section 801 that authorizes the use of comparability studies is well within constitutional bounds. Carmichaels Arbors has no contractual right to a recalculation based on the AAAFs if, as in this case, HUD has found material differences between the AAAF-produced rental adjustment and prevailing rents for comparable unassisted units. Therefore, Carmichaels Arbors has no property right on which to base a due process challenge.

The portion of section 801 that imposes a settlement for past claimed adjustments is facially constitutional for the same reason. Section 801 required HUD to settle with those owners whose AAAF-mandated rental adjustments were adjusted downward. Section 801 directed HUD to pay these owners the higher of the result obtained by applying the AAAFs to the portion of the total contract rent that would not be used by the owners to service their debt on the property, or by multiplying thirty percent of the proper AAAF by the entire contract. 42 U.S.C. § 1437f(c)(2)(C). This provision is constitutionally valid because the right it is said to violate, Carmichaels Arbors' supposed right to a calculation of rental adjustments based on the AAAFs, is nonexistent under the circumstances of this case.[9]

### C. Conclusion

Based on the foregoing, the court concludes that HUD is entitled to a partial summary judgment that the portion of section 801 challenged in this case, codified at 42 U.S.C. § 1437f(c)(2)(C), is facially constitutional. HUD is not entitled to a complete summary judgment, however, because it has not pointed to any evidence negating Carmichaels Arbors' claims that the rental

of the comparability studies, we need not resolve this issue.

9. The court notes in passing that although Carmichaels Arbors has no contractual right to any specific manner of rental adjustment when the application of the AAAFs results in a material difference, it may in this same circumstance have a property right to a rental adjustment at least equal to the rents commanded by compa-

adjustment procedures violated the requirements of administrative law.

rable unassisted units. If such a right had been pled, the court would have been required to determine whether such a property right existed under the HAP contract, whether such a property right amounted to a debt, and whether Congress would have been able to impose settlements having the effect of eliminating part of the United States' debt.