# United States Court of Appeals
## For the First Circuit

No. 11-2241

MUNICIPALITY OF MAYAGÜEZ,

Plaintiff, Appellant,

v.

CORPORACIÓN PARA EL DESARROLLO DEL OESTE, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. Garcia-Gregory, U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Lipez, Circuit Judges.

Nicolás Nogueras-Cartagena, with whom Jely Cedeño Richiez and
Nogueras Law & Associates were on brief, for appellant.
Bámily López Ortiz for appellee.

August 7, 2013

**Lipez, <u>Circuit Judge.</u>** This lengthy and heated dispute involves a contract executed nearly thirty years ago by the Municipality of Mayagüez and a local development corporation, Corporación Para el Desarrollo del Oeste ("CPDO"). After many years of deteriorating relations between the two parties, Mayagüez filed the instant suit, alleging that CPDO's failure to comply with several regulations issued by the Department of Housing and Urban Development ("HUD") amounted to a breach of their contract under the laws of Puerto Rico.

After review, we conclude that Mayagüez's commonwealth law claim does not "arise under" federal law within the meaning of 28 U.S.C. § 1331. Therefore, we decline to reach the merits of plaintiff's appeal, vacate the judgment below, and remand to the district court with instructions that the plaintiff's claim be dismissed without prejudice for want of subject matter jurisdiction.

I.

**A. Facts**

To determine whether subject matter jurisdiction exists, we take the following well-pleaded facts from the complaint. <u>See</u> <u>Pejepscot Indus. Park, Inc.</u> v. <u>Me. Cent. R.R. Co.</u>, 215 F.3d 195, 197 (1st Cir. 2000); <u>see</u> <u>also</u> <u>Franchise Tax Bd.</u> v. <u>Constr. Laborers Vacation Trust</u>, 463 U.S. 1, 10-11 (1983) (discussing the well-pleaded complaint rule and noting that "a defendant may not remove

-2-

a case to federal court unless the <u>plaintiff</u>'s complaint establishes that the case 'arises under' federal law"); <u>Bernhard</u> v. <u>Whitney Nat'l Bank</u>, 523 F.3d 546, 551 (5th Cir. 2008) (noting that it is a "long-established axiom" that "a federal court has original or removal jurisdiction only if a federal question appears on the face of the plaintiff's well-pleaded complaint").

In the early 1980s, Mayagüez purchased several parcels of land with money it had received as part of a Community Development Block Grant ("CDBG") administered by HUD.[1]  Mayagüez and CPDO then executed an instrument known as "Deed 91," under which Mayaguez ceded the parcels to CPDO with the understanding that the land would be used for a project called "Villa Sultanita," to be developed in accordance with HUD's CDBG program guidelines and regulations.

Deed 91 states in relevant part[2]:

> SEVENTH: The Transferee Corporation . . . meets the requirements of section Five Hundred Seventy point two, zero, four (24 C.F.R. 570.204) of the Act known as the Housing and Community Development Act of nineteen seventy-four,
>
> . . . .
>
> NINTH: It is an indispensable condition for the

---

[1] The CDBG program was a grant program created and authorized by Congress as part of the Housing and Community Development Act of 1974, 42 U.S.C. § 5301.

[2] Deed 91 was written in Spanish.  All references in this opinion to Deed 91 are references to the certified English translation provided by the parties.

transfer herein that the Transferee use the transferred property solely and exclusively for the construction and sale of housing, commercial areas, and any other infrastructure needed. Said project shall be known as "VILLA SULTANITA," shall have a public purpose, and shall comply at all times with applicable state and federal laws, rules, and regulations. Said activity shall be carried out by the non-profit transferee. The parties also agree that THE TRANSFEROR . . . may unilaterally, and at its sole discretion require the following from the transferee:

. . . .

     B) The return of the transferred property if the transferor determines that it will not be used, or has not been used, for the specific purposes for which the transfer has been made;

. . . .

     TENTH: The Transferee will diligently and scrupulously make sure that the "Villa Sultanita Project" is carried out as per applicable state and federal laws, . . . .

Development of Villa Sultanita proceeded amicably enough for several years, until a new mayor of Mayagüez was elected in 1993. The new administration and CPDO were immediately at odds, and the relationship between the parties rapidly deteriorated, with each accusing the other of obstructing progress on the Villa Sultanita project. CPDO eventually sued Mayagüez in the commonwealth courts in October 1995. Mayagüez counter-sued. That litigation lasted for nearly a decade, until both parties agreed to dismiss their claims in 2004.

At the same time as the relationship between the parties imploded, HUD's Office of the Inspector General became concerned

that federal money was being mismanaged in Mayagüez. In 1997, HUD conducted an independent audit of Mayagüez's CDBG block grant administration, revealing that millions of dollars in CDBG block grant funds had been misused in Mayagüez.

The CDBG program's authorizing statute and regulations allow HUD to demand reimbursement from the grant recipient regardless of whether a sub-recipient, such as CPDO, was actually responsible for the mismanagement. See 42 U.S.C. § 5311; 24 C.F.R. § 570.910. Exercising this authority, HUD demanded that Mayagüez repay approximately $4 million in misused CDBG funds and barred the city from receiving further HUD development grants. Mayagüez repaid HUD and then filed the instant complaint in 2006, seeking compensation and damages from CPDO.[3]

In the complaint, Mayagüez alleged that CPDO was actually responsible for the mismanagement of the Villa Sultanita development uncovered in the Inspector General's audit. According to Mayagüez's theory of the case, in violating several HUD regulations, CPDO breached its promise in Deed 91 that the

---

[3] Though not explained in the complaint, evidence at trial revealed that in late 2004, Mayagüez's "repayment" agreement with HUD allowed Mayagüez to resolve the audit findings by "developing other projects paid for with local municipal funds that met CDBG criteria," rather than repaying HUD directly with municipal funds. Mun. of Mayagüez v. Corporación Para el Desarrollo del Oeste, 824 F. Supp. 2d 289, 293 (D.P.R. 2011). By the time HUD eventually closed its audit in November 2009, Mayagüez had expended "roughly $4,000,000" on municipal projects as "repayment" to HUD. Id. at 294.

development of Villa Sultanita would "comply at all times with applicable state and federal laws." Specifically, Mayagüez alleged that CPDO's management of Villa Sultanita violated several HUD regulations by: 1) failing to keep adequate accounting and auditing systems in place as required by 24 C.F.R. §§ 84.21, .52; 2) using funds for purposes other than those authorized under 24 C.F.R. § 570.309; 3) failing to comply with bid and competition requirements under 24 C.F.R. § 84.44; and 4) failing to comply with procurement requirements under 24 C.F.R. § 84.44.[4]

## B. District Court Proceedings

From the outset of this case, there were serious concerns about the existence of federal jurisdiction. Early in the proceedings, CPDO filed a motion under Federal Rule of Civil Procedure 12(b)(1) alleging that Mayagüez had failed to state a claim arising under the laws of the United States to establish federal jurisdiction under 28 U.S.C. § 1331. The district court referred the matter to a magistrate judge, who concluded that federal-question jurisdiction in this case was proper under our decision in Municipality of San Juan v. Corporación Para El Fomento Económico de la Ciudad Capital, 415 F.3d 145 (1st Cir. 2005) ("COFECC"), a factually similar case concerning a dispute between

_____

[4] Mayagüez also brought claims against CPDO under the Autonomous Municipalities Act of Puerto Rico, 21 L.P.R.A. § 4001. These Commonwealth law claims are not relevant to the question of federal jurisdiction. We do not address them.

-6-

a municipality and a local development corporation over the misuse of HUD grants.

The district court accepted the magistrate judge's recommendation, and acrimonious pre-trial proceedings continued for several years, culminating in a week-long bench trial in 2010. CPDO argued at trial that it had not violated the terms of Deed 91 because it had always managed the Villa Sultanita project in line with HUD guidelines, and any adverse findings in the HUD audit were actually the result of Mayagüez's refusal to communicate in any form with CPDO. According to CPDO, HUD gave Mayagüez the opportunity to "sanitize" the audit findings if the city could provide information indicating that the grant money had been spent in compliance with the CDBG program purposes and guidelines. CPDO claimed that it could have provided this information to HUD, but was prevented from doing so by the mayor of Mayagüez. Indeed, CPDO argued that the mayor's antipathy for CPDO was so great that he chose to repay nearly $4,000,000 in funds rather than work cooperatively with CPDO.

In addition to its arguments on the merits, CPDO again moved to dismiss at trial for lack of subject matter jurisdiction. CPDO offered evidence that in the years since Mayagüez filed its complaint, HUD had administratively closed its audit against Mayagüez. According to CPDO, once the HUD investigation against Mayagüez was closed and could no longer be challenged, no federal

-7-

issue remained.  The district court disagreed, concluding that Mayagüez's agreement to repay HUD did not resolve the question of whether CPDO had breached its responsibilities as a sub-grantee, which were memorialized in Deed 91.  In the district court's opinion, resolving the dispute between CPDO and Mayagüez continued to "turn[] heavily upon determining whether federal regulations, as incorporated into the contract between the parties, were complied with."  Mun. of Mayagüez v. Corporación Para el Desarrollo del Oeste, 824 F. Supp. 2d 289, 294 n.1 (D.P.R. 2011) (emphasis supplied).

At the same time that the district court denied CPDO's motion to dismiss for want of jurisdiction, however, the court also concluded that Mayagüez had failed to demonstrate that CPDO breached any provisions of Deed 91.  As such, the court dismissed Mayagüez's claims with prejudice. Mayagüez filed this appeal, challenging the district court's decision on the merits.

After reviewing the parties' initial merits briefs in this case, we identified a significant question concerning our jurisdiction.  In particular, we believed that our jurisdictional holding in COFECC, on which the magistrate judge relied, might no longer be good law in light of the Supreme Court's intervening opinions in Empire Health Assurance, Inc. v. McVeigh, 547 U.S. 677 (2006), and Gunn v. Minton, 133 S.Ct. 1059 (2013).  To our surprise, neither party raised this thorny jurisdictional issue in

-8-

its merits briefs before us. Therefore, given our unflagging obligation to determine our own jurisdiction sua sponte, see Am. Airlines, Inc. v. Cardoza-Rodriquez, 133 F.3d 111, 115 n.1 (1st Cir. 1998), we requested supplemental briefing from both parties on the issue of whether this dispute arises under federal law within the meaning of 28 U.S.C. § 1331.

## II.

"Congress has authorized the federal district courts to exercise original jurisdiction in 'all civil actions arising under the Constitution, laws, or treaties of the United States.'" Gunn, 133 S.Ct. at 1064 (quoting 28 U.S.C. § 1331). Often called "federal-question jurisdiction," this type of jurisdiction "is invoked by and large by plaintiffs pleading a cause of action created by federal law," such as an action brought under 42 U.S.C. § 1983. Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 312 (2005). There exists, however, a "special and small category" of cases in which a state law cause of action can give rise to federal-question jurisdiction because the claim involves important federal issues. Empire Health Assurance, 547 U.S. at 699.

Though the Supreme Court has repeatedly reaffirmed the viability of this "special and small category," a precise definition of its contours remains elusive. Indeed, the complexity of the inquiry has "kept [the Supreme Court] from

-9-

stating a single, precise, all-embracing test for jurisdiction over federal issues embedded in state-law claims between non diverse parties."  Grable, 545 U.S. at 314 (internal citation omitted) (quotation marks omitted); see also Gunn, 133 S.Ct. at 1065 ("In outlining the contours of this slim category, we do not paint on a blank canvas.  Unfortunately, the canvas looks like one that Jackson Pollock got to first.").

We consider first the Supreme Court's most recent pronouncements on what makes a federal issue sufficiently "substantial" to warrant federal jurisdiction. We turn then to the case at bar, considering whether the issue in this case is so substantial as to "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues."  Grable, 545 U.S. at 312.

## A. A Substantial Federal Issue

Federal jurisdiction will lie over a state law cause of action if the face of the complaint reveals a "federal issue [that] is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in a federal court without disrupting the federal-state balance of power."  Gunn, 133 S.Ct. at 1065. According to Mayagüez, the federal issue in this case is whether CPDO's alleged failure to comply with HUD guidelines in managing the  federal grant money and in developing Villa Sultanita amounted to a breach of its contract with Mayagüez.  Assuming, arguendo,

that Mayagüez is correct in characterizing the federal issue in this case as necessarily raised, actually disputed, and not disruptive to the federal-state balance of power, we focus our analysis on the question at the heart of this jurisdictional dispute: is this federal issue sufficiently "substantial" to warrant federal jurisdiction?[5]

In its most recent pronouncements on the question of substantiality in this context, the Supreme Court has emphasized that the "substantiality" inquiry is wholly separate from the "necessary" inquiry, and demands that a federal question must be not only important to the parties, but important to the federal system. In Gunn, for example, the Court explained that for a case to be "substantial in the relevant sense,"

> it is not enough that the federal issue be significant to the particular parties in the immediate suit; that will <u>always</u> be true when the state claim 'necessarily raises' a disputed federal issue . . . . <u>The substantiality inquiry . . . looks instead to the importance of the issue to the federal system as a whole.</u>

Gunn, 133 S.Ct. at 1066 (second emphasis supplied).

---

[5]  Both before the district court and in its supplemental briefings before us, CPDO argued that even if a substantial federal issue existed at the time Mayagüez filed its complaint in 2007, that issue, and thus federal jurisdiction, was extinguished when the HUD audit was closed in 2009. We make no judgment on the viability of the argument that an issue that meets the substantiality requirement on the face of the complaint can become insubstantial, and hence incompatible with federal jurisdiction, during the course of litigation. We decide the "substantiality" issue on the basis of the complaint.

-11-

But what makes an issue important to the federal system as a whole? Recent Supreme Court case law has suggested at least two answers to this question. First, an issue may be substantial where the outcome of the claim could turn on a new interpretation of a federal statute or regulation which will govern a large number of cases. In other words, a case is more likely to be important to the federal system as a whole if it presents "a nearly 'pure issue of law . . . that could be settled once and for all'" rather than an issue that is "fact-bound and situation-specific" and whose holding will more likely be limited to the facts of the case. Empire Health Assurance, 547 U.S. at 700-701 (quoting R. Fallon, et al., Hart and Wechsler's The Federal Courts and the Federal System 65 (2005 Supp.)); see also Gunn, 133 S.Ct. at 1067 (noting that the federal issue in dispute was not important because its resolution was unlikely to have any impact on other patent cases).

Second, a federal issue may also be substantial where the resolution of the issue has "broader significance . . . for the Federal Government." Gunn, 133 S.Ct. at 1066. That is, because "[t]he Government has a direct interest in the availability of a federal forum to vindicate its own administrative action," Grable, 545 U.S. at 315, the Court has repeatedly suggested that a federal issue is more likely to be substantial where a claim between two private parties, though based in state law, directly challenges the propriety of an action taken by "a federal department, agency, or

service." Empire Health Assurance, 547 U.S. at 700 (discussing Grable); see also Smith v. Kan. City Title & Trust Co., 255 U.S. 180 (1921) (holding that a shareholder suit seeking to enjoin a private company from investing in certain federal bonds on the grounds that the statute authorizing the issuance of those bonds was unconstitutional presented substantial federal issue).

**B. The Federal Issue in this Case**

Mayagüez claims that its federal question is substantial because it turns on an interpretation of federal regulations, and because it relates to federal funds and a large federal development program. We think that this characterization seriously overstates the import of the federal issues in this case.

Though the ultimate question in Mayagüez's contract claim is whether CPDO failed to comply with federal regulations, and thereby breached its contract, this dispute is the sort of "fact-bound and situation-specific" claim whose resolution is unlikely to have any impact on the development of federal law. Empire Health Assurance, 547 U.S. at 701. Rather than disputes over the meaning of HUD regulations incorporated in the contract between the parties, the complaint reveals that the disputes between the parties were overwhelmingly factual. For example, Mayagüez alleged that certain parcels of land conveyed to CPDO had never been developed, and that CPDO had failed to obtain appraisals before it sold certain small parcels of land. It also claimed irregularities in CPDO's

accounting systems.

In addition, though the actions of a federal agency hover in the background of this dispute, HUD's actions are much farther removed from Mayagüez's breach-of-contract claim than the Internal Revenue Service's were from the plaintiff's claim in Grable. Though the plaintiff in Grable sued the individual who ultimately purchased the land at the tax sale, the allegedly unlawful actions were taken by the IRS, not the purchaser. Here, the audit indicated that HUD funds had been mismanaged, but there were never allegations that HUD itself acted inappropriately in any way. In other words, HUD's performance was never at issue, and hence, unlike in Grable, the outcome in this case could not call into question thousands of other actions undertaken by a federal agency.

Moreover, unlike Grable, the resolution of this case will have no impact on the ability of HUD or any other federal agency to carry out its business. Here, there was never any risk that HUD would not be compensated for the misspent funds, nor was there any risk that the outcome of the dispute would impact HUD's ability to demand repayment of federal funds in any future case. Our recent decision in One & Ken Valley Housing Group v. Maine State Housing Authority, 716 F.3d 218 (1st Cir. 2013), regarding a state law contract claim relating to the Section 8 program, is instructive on this point. We held there that the issue was sufficiently substantial to warrant federal jurisdiction because, inter alia,

-14-

the dispute turned "on the interpretation of a contract provision approved by a federal agency pursuant to a federal statutory scheme," "the alleged breach occurred only because the contractor was following the federal agency's explicit instructions," and "the case presents a pure issue of law that will govern numerous cases nationwide." We explained that the outcome of the case could have such profound financial consequences for HUD that it "could require the agenc[y] to scale back the scope of the Section 8 program." Id. at 225. In this case, HUD did not draft the contract between the parties or issue instructions that led to the alleged breach, and there is no legal question that will apply in a host of other cases. There is simply no comparable risk here to any federal program.

One final issue remains: the plaintiffs ask us to conclude that our jurisdictional holding in Municipality of San Juan v. Corporación Para El Fomento Económico de la Ciudad Capital, 415 F.3d 145 (1st Cir. 2005) ("COFECC"), controls the outcome of this case. Like the instant case, COFECC was a state law breach-of-contract claim brought by a municipality against a local development corporation, alleging that the local development corporation breached the contract when it misused federal funds entrusted to it by the municipality. Though neither party briefed subject matter jurisdiction, we addressed the issue sua sponte, concluding in a footnote that "[b]ecause the propriety of COFECC's

-15-

conduct turns entirely on its adherence to the intricate and detailed set of federal regulatory requirements, and the funds at issue are federal grant monies . . . jurisdiction is proper." Id. at 148 n.6.

Plaintiff's argument, however, fails to consider the Supreme Court's intervening opinions in Gunn and Empire Health Assurance, both of which cast serious doubts on the continued viability of our jurisdictional holding in COFECC. The Court's rejection of jurisdiction in Empire Health Assurance is particularly telling.

As here, Empire Health Assurance was a contract dispute between two private parties -- a private health insurer and a federal employee.[6] The insurer had entered into a contract with the Office of Personnel Management ("OPM") to provide a fee-for-service health plan for federal employees, pursuant to the Federal Employees Health Benefits Act of 1959 ("FEHBA"), 5 U.S.C. § 8901.[7] The insured had enrolled in the health insurance plan. As part of his enrollment, he had agreed to abide by the terms and conditions

---

[6] The employee died before the state court judgment was entered in his favor, and the suit was filed against his wife as administrator of his estate. See Empire Health Assurance, 547 U.S. at 687.

[7] FEHBA "establishes a comprehensive program of health insurance for federal employees. The Act authorizes the Office of Personnel Management (OPM) to contract with private carriers to offer federal employees an array of health-care plans." Empire Health Assurance, 547 U.S. at 682. Approximately 8 million federal employees, retirees, and dependents are covered by plans created under the FEHBA program. Id. at 702 (Breyer, J., dissenting).

-16-

in the statement of benefits, which included a reimbursement and subrogation clause.

The dispute between the parties arose after the employee, who had been injured in an accident, won a state court tort suit against the party responsible for his injuries. 547 U.S. at 687. The insurer claimed that under the terms and conditions established in the plan that it had negotiated with OPM, the insurer was entitled to be reimbursed for the money it had spent to cover the employee's medical bills following the accident.[8] Id. The employee disagreed and refused to repay the insurer. Id.

Despite the involvement of a federal agency in the creation of the contract terms in dispute and the federal funds involved,[9] the

---

[8] Though FEHBA itself does not address reimbursement and subrogation, the contract between OPM and the insurer provided that all employees enrolled in the plan "are obligated to all terms, conditions, and provisions of this contract," and a brochure appended to the contract explained the insurer's subrogation and recovery rights. Empire Health Assurance, 547 U.S. at 684-85. The statement of benefits read in part: "[I]f we pay benefits for [an] injury or illness, you must agree to the following: All recoveries you obtain . . . must be used to reimburse us in full for benefits we paid." Id. at 684.

[9] Though private insurers administer the FEHBA plans, the program is funded through premiums paid jointly by the government and the employees into a special trust fund in the Treasury. Claims and benefits for covered services are paid with money from the fund and "the fund's money belongs, not to the carrier, but to the federal agency that administers the program." Empire Health Assurance, 547 U.S. at 703 (Breyer, J., dissenting). "After benefits are paid, any surplus in the fund can be used at the agency's discretion to reduce premiums, to increase plan benefits, or to make a refund to the Government and enrollees." Id. (citing 5 U.S.C. § 8909(b), 5 C.F.R. § 890.5039(c)(2)). All financial risk is thus borne by the government, not the carrier. See id.

Supreme Court concluded that the federal issues in the case were not sufficiently substantial to warrant federal jurisdiction over the state law reimbursement claim. Id. at 700. Though the Court admitted that the federal government undoubtedly had an "overwhelming" interest in attracting and retaining healthy federal employees, the Court concluded that such an interest did "not warrant turning into a discrete and costly 'federal case' an insurer's contract-derived claim to be reimbursed from the proceeds of a federal worker's state-court-initiated tort litigation." Id. at 701.

If there is no substantial federal issue in a case interpreting contract terms negotiated by a federal agency and applying to policies held by eight million federal employees, it is difficult to see how the instant dispute between Mayagüez and CPDO could fit into the "special and small" category of state law cases that "arise under" federal law. Indeed, the dispute between Mayagüez and CPDO is notably similar to that in Empire Health Assurance (a demand for the reimbursement of funds expended by one of the parties to the contract), differing only insofar as the federal interest in the instant dispute is less significant. Unlike the circumstances in Empire Health Assurance, the contract here -- so far as it appears from the complaint -- was executed without much oversight from a federal agency. Mayagüez and CPDO chose to incorporate federal regulations into their private

agreement, and the level of federal government involvement in the contracting process was minimal when compared to that in Empire Health Assurance. Moreover, the statute at issue in Empire Health Assurance was designed to benefit the federal government by making the federal government an attractive, competitive employer. The purpose of the CDBG block grant program, on the other hand, was to provide assistance to municipalities seeking to improve their infrastructure.

In short, we think that the Court's holding in Empire Health Assurance undermines our conclusion in COFECC that compliance with an "intricate and detailed set of federal regulatory requirements" and a connection to "federal monies" were sufficient in themselves to warrant federal-question jurisdiction over a state law breach of contract claim. Under the Court's opinion in Empire Health Assurance, to be substantial, the dispute must involve a true risk to the interests of a federal agency, program, or statutory scheme. The instant case presents no such risk. Thus, we abrogate the jurisdictional holding in COFECC and decline to treat that holding as controlling precedent in this case.

**C. Conclusion**

Having determined that this case presents primarily factual disputes and would have little impact on the development of federal law or the activities of a federal agency, we conclude that the federal issue in this case is not substantial in the relevant sense

-19-

to warrant federal jurisdiction.  As such, plaintiff's claims should have been dismissed at the outset of this litigation.  We thus **vacate** the judgment of the district court and **remand** with instructions that plaintiff's claim be dismissed without prejudice.  Costs are awarded to the appellee.

**So ordered.**