# United States Court of Appeals
## For the First Circuit

No. 21-1043

AMTAX HOLDINGS 227, LLC and TAX CREDIT HOLDINGS III, LLC,

Plaintiffs, Appellants,

v.

TENANTS' DEVELOPMENT II CORP. and TENANTS' DEVELOPMENT CORP.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

Before

Kayatta, Selya, and Barron,
Circuit Judges.

Louis E. Dolan, Jr., with whom Stephen M. LaRose and Nixon
Peabody LLP were on brief, for appellants.
David A. Davenport, with whom BC Davenport, LLC was on brief,
for appellees.

October 13, 2021

**SELYA**, **Circuit Judge**. Federal courts are courts of limited jurisdiction, and this appeal requires us to decide whether the case at hand sufficiently implicates federal interests so as to "aris[e] under federal law," 28 U.S.C. § 1331, and thus galvanize a federal district court's subject-matter jurisdiction. The court below answered this question in the negative, see Tenants' Dev. Corp. v. AMTAX Holdings 227, LLC, No. 20-10902, 2020 WL 7646934, at *3-4 (D. Mass. Dec. 23, 2020), and — although our reasoning differs somewhat — our answer is the same. Consequently, we affirm the district court's dismissal of the action for want of subject-matter jurisdiction.

## I. BACKGROUND

We draw upon the well-pleaded facts adumbrated in the complaint filed by AMTAX Holdings 227, LLC (AMTAX) and Tax Credit Holdings III, LLC (TCH), plaintiffs below and appellants here. In the process, we "read the allegations . . . liberally . . . and tak[e] all inferences in favor of the plaintiff[s]." P.R. Tel. Co. v. Telecomms. Regul. Bd. of P.R., 189 F.3d 1, 7 (1st Cir. 1999).

The controversy giving rise to this litigation stems from a tug of war over the fate of a scattered-site affordable housing development located in Boston's south end (the Project). Defendant-appellee Tenants' Development Corporation (TDC) is a not-for-profit corporation that promotes access to affordable

- 2 -

housing.  TDC owns seventy-nine percent of the stock in an affiliated corporation, defendant-appellee Tenants' Development II Corporation (TD II).  As shortly will appear, both TDC and TD II have ties to the Project.

The chronology of relevant events began on April 11, 2002, when TD II organized a limited partnership (the Partnership) under Massachusetts law.  TDC agreed to ground-lease the Project to the Partnership for fifty years to allow the Partnership to "redevelop, rehabilitate, renovate, develop, repair, improve, maintain, operate, lease, dispose of, and otherwise deal with" the Project in accordance with stated terms.  TDC became a limited partner in the Partnership and TD II became the managing general partner — a role in which it had exclusive authority to "manage the business and affairs of the Partnership."

The original partnership agreement proved to be a temporary chrysalis for the joint endeavor.  Some fourteen months into the life of the Partnership, TDC and TD II executed an amended limited partnership agreement (the Agreement), which was designed to qualify the Project for federal low-income housing tax credits (LIHTC).  See 26 U.S.C. § 42.

At this point, some background is useful.  Congress created the LIHTC program in the Tax Reform Act of 1986.  See Pub. L. No. 99-514, § 252, 100 Stat 2085, 2189-208 (1986) (codified at 26 U.S.C. § 42).  The program incentivizes private investors to

finance affordable housing development in exchange for credit against their federal income tax liability. See Mark P. Keightley, Cong. Rsch. Serv., RS22389, An Introduction to the Low-Income Housing Tax Credit 1, 6 (2021). Under it, the government allocates tax credits annually to each state, and the state in turn allocates credits to selected housing developers for use in connection with qualified projects. See 8 Scott D. Schimick, Mertens Law of Fed. Income Tax'n § 32B:10 (2021).

A rental property must remain affordable for thirty years in order to qualify for a tax-credit allocation, see 26 U.S.C. §§ 42(g)(1), (h)(6)(A)-(D), although federal compliance reporting is only mandated during the first fifteen years of the commitment, see id. §§ 42(i)(1), (l)(1)-(2). For the duration of the compliance period, property owners must submit annual compliance reports to both the Internal Revenue Service (IRS) and a state monitoring agency. The federal reporting requirement ends after fifteen tax years, but state regulators may choose to continue their monitoring regimes for longer periods. See Office of Pol'y Dev. & Rsch., U.S. Dep't of Housing & Urban Dev., What Happens to Low-Income Housing Tax Credit Properties at Year 15 and Beyond? 37 (2012) [hereinafter Year 15 and Beyond].

Once an LIHTC project comes into service, the developer may claim the allocated tax credits over a ten-year period. See 26 U.S.C. § 42(f)(1). By this time, though, the developer often

will have sold the unrealized tax-credit allocation to an outside investor. See Keightley, supra, at 1. Developers and investors normally carry out such transactions through limited partnership agreements. As the general partner, the developer holds "a relatively small ownership percentage but maintains the authority to build and run the [housing] project on a day-to-day basis." Id. at 6. As a limited partner, the investor retains "a large ownership percentage with an otherwise passive role." Id. At the end of the compliance period, the investor's previously actualized tax benefits are no longer subject to recapture, see 26 U.S.C. § 42(j)(1), and the time may be ripe for the investor to bid farewell to the limited partnership.

Here, the Agreement reflects a somewhat typical LIHTC transaction. When the tax credits were sold, TDC withdrew as a limited partner, and the Partnership admitted AMTAX as an "investor limited partner." AMTAX made a significant capital contribution to the Partnership and received close to 100 percent of the tax-credit allocation.[1] TD II continued to oversee the Partnership's day-to-day operations in its capacity as managing general partner, but with added contractual obligations under the Agreement not to "take any action . . . which would cause the recapture of any

---

[1] At the same time, the Agreement was amended to admit Protech 2003-B as a "special limited partner." Protech 2003-B withdrew in 2011 and was replaced by TCH. For present purposes, we deem TCH's interests congruent with those of AMTAX.

Federal Housing Tax Credit" and "to avoid recapture of such credit for failure to comply with the requirements of Section 42."

On the day that AMTAX was admitted as a limited partner, the Partnership executed a separate contract with TDC. In consideration of "subsidies and development assistance" provided by TDC, through which the Partnership was "able to acquire and rehabilitate" the Project "at a favorable total cost," the Partnership granted TDC a right of first refusal in the event that the Partnership later proposed to sell "all or substantially all [of its] interest" in the Project to a bona fide third party. The agreement that embodied the right of first refusal (the ROFR Agreement) provided that the right, if exercised, would entitle TDC to purchase the Project at the lesser of the third-party offer price or "the sum of the principal amount of outstanding indebtedness secured by the [Project] . . . and all federal, state and local taxes attributable to such [a] sale" (the debt-plus-taxes price). The ROFR Agreement was duly recorded in local property records.

The debt-plus-taxes price corresponds to a statutory provision enacted in 1989 to allow tenants to purchase buildings at reduced cost at the end of the compliance period, see Pub. L. No. 101-239, § 7108, 103 Stat. 2106, 2321 (1989) (codified at 26 U.S.C. § 42(i)(7)(A)) — a right that was subsequently expanded to inure to the benefit of qualifying nonprofits, see Pub. L. No.

101-508, § 11407(b), 104 Stat. 1388, 1388-474 (1990) (codified at 26 U.S.C. § 42(i)(7)(A)). That provision creates a safe harbor within which qualifying organizations may negotiate "a right of first refusal to purchase a LIHTC property at the end of the compliance period." See Year 15 and Beyond, supra, at 31 n.20. This safe harbor is attractive from an investor's coign of vantage because the IRS ordinarily treats a below-market purchase option as a conditional transfer of ownership to the option-holder, see Rev. Rul. 55-540, 1955-2 C.B. 39, § 4.01(e), thus precluding an owner whose interest is subject to such a right from claiming any tax benefits associated with the asset. Section 42(i)(7) makes this general rule inapplicable when a qualifying organization holds the right of first refusal to purchase an LIHTC development. The safe harbor creates an incentive for private investment at the beginning of a project, allowing the investor to capture the tax credits while making it easier for tenant groups and nonprofits committed to "fostering low-income housing" to obtain ownership of the property for the long term. See 26 U.S.C. §§ 42(i)(7), (h)(5). The statute neither defines the term "right of 1st refusal" nor dictates how the contractual mechanism must operate (other than specifying who may hold and exercise such a right, when it may be exercised, and the minimum price). See id. § 42(i)(7).

At some time during the next fourteen years, AMTAX came under the control of Alden Torch Financial, LLC (Alden Torch).

Alden Torch took over the management of AMTAX's interest in the Partnership. The Project's compliance period was due to expire on December 31, 2018. As that date approached, AMTAX (through Alden Torch) entered into negotiations with TD II over the terms of its potential exit from the Partnership. When there was no meeting of the minds, Alden Torch notified TD II that AMTAX was exercising its right under the Agreement to force the Project's sale at fair market value. TD II promptly initiated a marketing process.

Ten months later, Alden Torch did an about-face, claiming that AMTAX had just learned of the ROFR Agreement. Alden Torch unilaterally declared that AMTAX now "rescind[ed] and revoke[d]" its previous exercise of the forced-sale option. AMTAX also denied that any rights under the ROFR Agreement had been triggered. TD II rejected this attempted rescission, questioning how AMTAX could be unaware of the ROFR Agreement (which was a matter of public record). And it took the position that, under the Agreement, AMTAX could not turn back the clock after having set the forced-sale process in motion.

On February 10, 2020, TD II notified TDC that the Partnership had received a bona fide third-party offer for the Project. That offer was in the approximate amount of $51,000,000. TDC responded by notifying TD II that it intended to purchase the

- 8 -

Project for the debt-plus-taxes price (approximately $17,000,000).[2]

In response, AMTAX sought leverage to strengthen its bargaining position. It recorded (in the Suffolk County Registry of Deeds) a notice reciting that "[AMTAX] ha[d] certain consent rights relating to the sale of the [Project]" and that it had not approved any sale. The recorded document caused the Project's mortgagee to conclude that it could not transfer the mortgage until the dispute between AMTAX and TD II was resolved.

With the parties at loggerheads, AMTAX (joined by TCH) sued TDC and TD II in the United States District Court for the District of Massachusetts.[3] Their complaint sought a declaratory judgment concerning the validity of the ROFR Agreement. Specifically, the appellants sought a declaration that the ROFR Agreement did not comply with section 42(i)(7); that the right of first refusal "could not have been . . . validly exercised;" and

_____

[2] Some perspective on these numbers may be gained by arraying them against the backdrop of AMTAX's initial investment and subsequent tax benefits. For capital contributions of a little more than $12,000,000, AMTAX received tax credits totaling over $15,000,000, together with a string of year-by-year tax losses over the life of the Project.

[3] In actuality, TDC and TD II were the first to file in the federal district court. Their suit, which named AMTAX and Alden Torch (among others) as defendants, was premised on the alleged existence of diversity jurisdiction. See 28 U.S.C. § 1332(a). When the assertion of diversity jurisdiction proved insupportable, the district court dismissed the suit for want of jurisdiction. No appeal has been taken from that ruling, and we make no further reference to this first-filed suit.

that, therefore, the ROFR Agreement should be declared void. The complaint also asserted a laundry list of state-law causes of action, including claims of breach of contract and breach of fiduciary duty against TD II; claims of tortious interference and aiding and abetting a fiduciary-duty breach against TDC; and claims of fraud and unfair trade practices against both TD II and TDC. Federal jurisdiction was premised on the existence of an embedded federal question. See R.I. Fishermen's All., Inc. v. R.I. Dep't of Env't Mgmt., 585 F.3d 42, 48 (1st Cir. 2009) (describing embedded federal jurisdiction as jurisdiction attaching to a suit "in which the plaintiff pleads a state-law cause of action, but that cause of action 'necessarily raise[s] a stated federal issue'" (quoting Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 314 (2005))). In particular, the appellants alleged that the claims stated in their complaint (or, at least, their declaratory judgment claim) required the district court to resolve whether the ROFR Agreement violated 26 U.S.C. § 42(i)(7). The precise scope of the statutory right would in their view determine whether that contract should be declared void because it departed from the federal scheme. Extending this reasoning, they said that the same determination would show whether TD II "materially breached" terms of the Agreement (such as the prohibition against any action that could cause recapture of federal tax credits) when it formed the contract with TDC.

TDC and TD II moved to dismiss the appellants' suit for want of federal subject-matter jurisdiction. The appellants opposed the motion. The district court rejected the appellants' jurisdictional theory and dismissed the suit. See Tenants' Dev. Corp., 2020 WL 7646934, at *3-4.

In reaching this result, the court recognized the four-part test for embedded federal jurisdiction articulated by the Supreme Court, which requires the appellants to demonstrate that "a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." Gunn v. Minton, 568 U.S. 251, 258 (2013). Three of these four elements, the district court said, were missing in this case: although the parties disagreed about the meaning of section 42(i)(7), the federal-law controversy was not necessarily raised, substantial, or appropriate for federal intervention. See Tenants' Dev. Corp., 2020 WL 7646934, at *3-4. This timely appeal followed.

## II. ANALYSIS

"We review the granting of a motion to dismiss for lack of subject matter jurisdiction de novo" and may affirm the lower court's judgment based on "any ground made manifest by the record." Román-Cancel v. United States, 613 F.3d 37, 41 (1st Cir. 2010). Given the appellants' theory of federal jurisdiction and this

standard of review, we consider afresh whether the complaint falls into the "'special and small category of cases' where a 'state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities.'" One & Ken Valley Hous. Grp. v. Me. State Hous. Auth., 716 F.3d 218, 224 (1st Cir. 2013) (alteration in original) (quoting Gunn, 568 U.S. at 258).

Two familiar principles guide our inquiry. First, "it is irrefragable that the burden of establishing jurisdiction must fall to the party who asserts it." Woo v. Spackman, 988 F.3d 47, 53 (1st Cir. 2021). It follows that the appellants must shoulder that burden here. Second, any putative federal question must be clearly stated on the face of the appellants' complaint, not fashioned ex post. See R.I. Fishermen's All., 585 F.3d at 48 (describing well-pleaded complaint rule).

Refined to bare essence, this is a dispute over a contract, the ROFR Agreement. As we already have explained, the ROFR Agreement sets out a right of first refusal at a purchase price equal to the lesser of a bona fide third-party offer price or the debt-plus-taxes price. TDC holds this right of first refusal and chose to exercise it after AMTAX exercised its forced-sale option, marketing of the Project began, and TDC asserts that a bona fide third-party offer had been secured. Having had second

- 12 -

thoughts once they realized that TDC would seek to exercise its option to purchase the Project at the debt-plus-taxes price, the appellants now prefer to retain their ownership interest — but they may do so only if TDC cannot exercise its right of first refusal.

To that end, the appellants asked the district court to declare the ROFR Agreement "void, void ab initio, and[] otherwise ineffective," contending that it does not comport with the right of first refusal contemplated by 26 U.S.C. § 42(i)(7). The appellants posit that the statute defines the right as being triggered only when the property owner receives a bona fide purchase offer that it is willing to accept. By contrast, TDC and TD II assert that "[s]ection 42 does not purport to specify all of the possible terms and conditions of th[e] 'right of 1st refusal,'" leaving private parties to "freely negotiate" how the contractual mechanism will operate in any given instance subject to the statute's explicit restrictions on when the right may be exercised and to the debt-plus-taxes minimum price.

This dispute over the proper construction of section 42(i)(7) is the hook upon which the appellants hang their argument for federal jurisdiction. The need to test the validity of the parties' conflicting constructions is necessarily raised, the appellants say, by their prayer for declaratory relief seeking to void the ROFR Agreement because it is out of sync with section

42(i)(7). The potential of noncompliance, they submit, presents a "threshold" federal question, which — until resolved — precludes any court from properly interpreting the ROFR Agreement.

We do not gainsay that the parties disagree about the meaning and reach of section 42(i)(7). To support embedded federal jurisdiction, though, it is not enough that a federal issue is "actually disputed." See Gunn, 568 U.S. at 258. The federal issue must also be "necessarily raised," "substantial," and "capable of resolution in federal court without disrupting the federal-state balance approved by Congress." Id.

We are doubtful that this case, as presented by the appellants, necessarily raises a federal issue. Section 42(i)(7) provides only that "no Federal income tax credit shall fail to be allowable" when a qualifying right of first refusal is in effect. Nothing in the statute either suggests or implies that it voids noncompliant right of first refusal agreements. The notion that section 42(i)(7) independently voids noncompliant agreements rather than simply making a party or a project ineligible for certain tax benefits borders on the specious and seems too thin a reed to support federal jurisdiction. See Abraugh v. Y H Corp., 546 U.S. 500, 513 n.10 (2006) ("A claim invoking federal-question jurisdiction under 28 U.S.C. § 1331 . . . may be dismissed for want of subject-matter jurisdiction if it is not colorable, i.e., if it is 'immaterial and made solely for the purpose of obtaining

jurisdiction' or is 'wholly insubstantial and frivolous.'" (quoting Bell v. Hood, 327 U.S. 678, 682-83 (1946))). To the extent that the appellants' bid for federal jurisdiction rests on this theory — and the preponderance of their briefing suggests that it rests exclusively there — the proposed federal issue also lacks substantiality.

Substantiality demands that an embedded federal question be "important to the federal system," not just to the parties. Mun. of Mayagüez v. Corporación Para el Desarrollo del Oeste, Inc., 726 F.3d 8, 14 (1st Cir. 2013). There are multiple possible ways in which to satisfy this test, such as when a state-law claim "directly challenges the propriety of an action taken by 'a federal department, agency, or service,'" id. (quoting Empire Healthchoice Assurance, Inc. v. McVeigh, 547 U.S. 677, 700 (2006)), or will otherwise yield "a new interpretation of [federal law] which will govern a large number of cases," id. The common thread that runs through all such suits is that they entail some appreciable measure of risk to the federal sovereign. See id.

The federal question posed by the appellants involves no such jeopardy. Their complaint does not challenge — nor even implicate — concrete federal activity (such as an attempt by the IRS to recapture the Partnership's tax credits). And it is questionable whether the outcome of the litigation will have ramifications for other cases.

For aught that appears, right of first refusal agreements are sui generis. There is no standardized language for such agreements, nor is there any indication that developers and investors customarily use a one-size-fits-all prototype. In their briefing, the appellants have not furnished any basis for concluding that a large number of LIHTC transactions would be affected by the federal-law issue here. And the federal government already "delegates" LIHTC-related compliance matters "to state agencies as a matter of course," Templeton Bd. of Sewer Comm'rs. v. Am. Tissue Mills of Mass., Inc., 352 F.3d 33, 41 (1st Cir. 2003), and it is not clear how a state court could destabilize the program by ruling on the meaning of section 42(i)(7). The short of it is that the theory advanced by the appellants in their briefing does not suggest broad significance to the federal government or other parties and, thus, lacks substantiality.

To be sure, the appellants' complaint also suggests that interpretation of section 42(i)(7) might be necessitated by claims for breach of provisions of the Agreement requiring TD II not to endanger tax benefits and to comply with section 42(i)(7). But the appellants never fleshed out that theory either in the district court or in their briefs to this court. In their opening brief in this court, the appellants adverted to this theory in a single sentence but made no effort to develop it. Instead, they hewed to the more general contention that the ROFR Agreement was "in

violation of Section 42 of the Internal Revenue Code, and thus is void and unenforceable." (emphasis in original). Nor did their reply brief make any effort to fill this void. Indeed, it was not until oral argument that the appellants explained — and again without substantial elaboration — that one of the causes of action underpinning the declaratory judgment count was a breach of contract claim based on the "express provision in the Partnership Agreement that obligates the general partner to comply with statutory requirements." Critical elements of this line of reasoning, such as how the recapture process works and whether the tax credits the Project received might be imperiled, also remained unexplored.

It may or may not be that this breach of contract theory would necessarily implicate the proper interpretation of section 42(i)(7) and would present a substantial issue of relevance to other cases. But that question is not properly before us, and we need not answer it. It is the party claiming federal jurisdiction that bears the burden of making such arguments face up and squarely, and it is a "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990); see United States v. Merritt, 945 F.3d 578, 585 n.3 (1st Cir. 2019) ("Arguments not advanced before the district court or in a party's briefs and then

raised for the first time at oral argument are 'doubly waived.'" (quoting United States v. Leoner-Aguirre, 939 F.3d 310, 319 (1st Cir. 2019))); Teamsters Union, Loc. No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992) ("If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal."). The appellants' undeveloped breach of contract theory is waived and, as such, cannot rescue their bid for federal jurisdiction.

To say more would be supererogatory.[4] We hold that the district court did not err in concluding that the complaint in this case failed to trigger embedded federal question jurisdiction.

**III. CONCLUSION**

We need go no further. For the reasons elucidated above, the district court's dismissal of the action for want of federal subject-matter jurisdiction is

**Affirmed**.

---

[4] Our reasoning makes it unnecessary for us to delve into the extent (if at all) to which the appellants' complaint implicates the congressionally approved balance of federal and state judicial responsibilities. At first blush, though, any such implication appears to be minimal.

- 18 -